652 A.2d 116

MARYLAND AVIATION ADMINISTRATION

. v.

R. Wayne NEWSOME.

No. 38, September Term, 1994.

Court of Appeals of Maryland.

Jan. 13, 1995.

Evelyn O. Cannon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Louisa H. Goldstein and Janice G. Salzman, Asst. Attys. Gen., on brief), Baltimore, for petitioner.

Ira C. Cooke (Howard L. Alderman, Jr., Levin & Gann, P.A., on brief), Towson, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

In the area surrounding the Baltimore–Washington International Airport (BWI) a General Assembly enactment overlays on the county zoning a form of environmental zoning designed to protect building occupants from excessive noise. The regulatory scheme identifies areas of high levels of noise and, *inter alia*, prohibits new residential construction there, absent a variance. At issue in the instant matter is whether the agency empowered to grant a variance from the prohibition may properly consider the number of additional persons who would be exposed to high levels of noise if a requested variance were granted. In *Maryland Aviation Admin. v. Newsome,* 99 Md.App. 269, 637 A.2d 469 (1994), the Court of Special Appeals held that the agency could not properly consider "density." As explained below, we disagree.

Authorization for the BWI overlay noise zone originated in the Environmental Noise Act of 1974, Chapter 287 of the Acts of 1974. It was enacted for "the purpose of establishing environmental noise control," including "the prevention of new noise problems in areas near airports through the adoption of noise abatement plans and the establishment and enforcement of noise zone regulations...." 1974 Md.Laws at 995. Under that enactment, as revised, noise zone regulations for State-owned airports are administered by the petitioner, Maryland Aviation Administration (MAA). *See generally,* Maryland Code (1977, 1993 Repl.Vol., 1994 Cum.Supp.), §§ 5–801 through 5–824 of the Transportation Article (TR); Maryland Regs.Code (COMAR) tit. 11, §§ 03.03.01 through 03.03.06 (1994); and, as to BWI, *see* COMAR § 11.03.01.12.

Noise zoning is achieved by zone mapping and by the text of regulations. The initial regulations under the Environmental Noise Act of 1974 were adopted effective August 6, 1975. 2:17 Md.Reg. 1192 (adopting regulations proposed at 2:8 Md.Reg. 607 (Apr. 16, 1975)). The maps present contours of equal noise exposure. COMAR § 11.03.03.04B. The initial maps, with supplemental information, for airports existing July 1, 1975, such as BWI, were required to be submitted by January 1, 1976. 2:17 Md.Reg. 1192 (adoption); 2:8 Md.Reg. 612 (1975) (proposal). The contours of equal noise exposure represent the exposure "in terms of the day-night average sound level $[L_{dn}]$." COMAR § 11.03.03.02D(1).[1] Maps for the BWI noise zone present the 65, 70, and 75 $L_{dn}$ contours overprinted on county tax maps. COMAR § 11.03.01.12B(3). Since 1975 the limit under the regulations for cumulative noise exposure for land used as "[r]esidential single and two family; mobile homes" has been 65 $L_{dn}$. COMAR § 11.03.03.03B(1).

The respondent, R. Wayne Newsome (Newsome), in approximately 1989 purchased land in Howard County in the vicinity of BWI. Under the Howard County zoning regulations some of the land was zoned as M–2, permitting manufacturing use, and some of the land was zoned as R–12, a residential use. Part of Newsome's purchase is the 6.3 acre area that is the subject of the proceedings before us (the Property). It consists of twenty-seven, unimproved, R–12 lots shown on the subdivision plat of Lennox Park, a recorded subdivision in the Dorsey area near the boundary between Howard and Anne Arundel Counties.[2]

The Property lies within the BWI noise zone, and we are

---

1. " 'Annual day-night (average) sound level $(L_{dn})$' means for locations in the neighborhood of an airport, the day-night (average) sound level, in decibels, resulting from the effective annual average daily traffic and the utilization of runways and flight paths that affect the noise exposure at the location in question." COMAR § 11.03.03.01.A(1).

2. Portions of three of the twenty-seven lots comprising the Property lie in an M–2 zone. Newsome's proposal, however, is to have residences erected only on the residentially zoned portions of those three lots.

concerned here with the zone as certified in 1988.[3] Dividing the Property approximately in half is the 70 $L_{dn}$ contour line. Consequently, if residences were constructed and occupied on the Property, residents of the homes further from BWI would be subjected to a 69 $L_{dn}$, and residents of homes nearer BWI on the Property would be subjected to 70 $L_{dn}$. If used residentially the Property would become an "impacted land use area." TR § 5–801(d). That definitional phrase means "an area within a noise zone occupied by a land use with a limit for cumulative noise exposure that is less than the actual cumulative noise exposure in that area." *Id.*

Within the BWI noise zone a "person may not ... [e]stablish or construct any new structure" unless that person has an appropriate permit issued by the MAA. TR § 5–821(a)(1). TR § 5–821(c), however, establishes the following prohibitions:

"The [MAA] may not grant a permit if the proposed action would:

(1) Enlarge the size of or create an impacted land use area; or

(2) Violate local land use and zoning laws."

Newsome sought from the MAA a permit for the construction of twenty-seven residences, one per platted lot, on the Property, but the MAA, under the above-quoted prohibition, could not create an impacted land use area.

Within the Department of Transportation there is a Board of Airport Zoning Appeals (the Board). TR § 5–506(a). The Board is empowered to grant variances from decisions of the MAA, including a decision denying the permit required by TR § 5–821. TR § 5–822(a), (b), and (c). Newsome petitioned the Board to grant a variance from the denial of a permit for constructing residences on the Property.

The Board denied the variance in April 1991. Newsome sought judicial review in the Circuit Court for Anne Arundel

---

3. In addition to measurements of actual sound, noise zone delineation includes projections of future flight operations. The 1988 BWI noise study projected increased operations to the west of BWI, in the direction of the Property.

County. It reversed the Board and directed that a variance be granted subject to certain conditions mandated by TR § 5–822(c).[4] The MAA appealed to the Court of Special Appeals, which affirmed the circuit court. The intermediate appellate court interpreted the Board's decision to have been based on density, and the court concluded, as a matter of law, that that consideration was beyond the power of the Board.

We granted MAA's petition for certiorari which essentially asks whether the noise zone statutes and regulations allow "the Board to consider the high population density resulting from a developer's application for a variance[.]" In his response to the petition Newsome submitted that the previously reviewing courts properly evaluated the Board's statutory authority, and Newsome raised no additional questions for our possible review. In his brief to us Newsome states the question presented to be:

"Did the Board of Airport Zoning Appeals exceed its statutory authority relative to variances from airport noise regulations by:

i) its reliance on a presumed number of people that would occupy newly constructed houses as the primary factor in its denial of a Petition for Variance ...; and

ii) failing to consider the impact of its denial of the variance on the surrounding community?"

Brief of Respondent at 3.

Analysis of the Board's decision requires a more detailed description of the Property and of the Lennox Park subdivi-

---

4. TR § 5–822(c) requires that any variance granted by the Board be subject to the following two conditions:

"(1) Construct the proposed structure so as to comply with all applicable noise insulation regulations promulgated by the [MAA]; and

(2) Grant to the [MAA] an avigation easement as defined by § 5–1201(h) of this title, such easement including a provision relinquishing any right to receive remuneration or other compensation or benefit under any program of this State designed to allay, abate, or compensate for the effects of aircraft noise and emissions in connection with the operation of Baltimore/Washington International Airport."

sion. Lennox Park lies southwest of Dorsey Road and northwest of the right-of-way of the former Baltimore & Ohio Railroad. To the south, west, and north of Lennox Park is property zoned M–2 by Howard County. Traversing the subdivision in a generally north-south direction are Magnolia, Lennox, and Cedar Avenues and, in a generally east-west direction Locust and Cherry Avenues, Elm Road–Park Place, and Linden Avenue. The Property is in the southwest section of the subdivision. In the area of Lennox Park lying outside the Property, approximately fifty-two residences had been built prior to the imposition of noise zone regulations. In the period between imposition of the regulations and the Board's hearing in this case, three variances had been granted, approving a total of five additional residences in three different blocks. We were advised at the hearing in this Court that a variance for three additional residences on adjacent lots in a fourth block in Lennox Park had been approved by the Board after its hearing in this case.

Within Lennox Park the current R–12 zoning permits one single-family, detached, dwelling unit per lot. The minimum lot size is 12,000 square feet. Comprehensive Zoning Plan for Howard County, Maryland §§ 107.B.1 and D.2.a (1991). The twenty-seven lots comprising the Property range in lot size from 7,500 to 12,000 square feet. Because the subdivision was recorded in the early 1900s, Newsome's proposal for one dwelling per lot is not prohibited by the Howard County Zoning Code. Most of the dwellings in the remaining portion of Lennox Park, outside of the Property, are located on multiple-lot sites.

In its written decision the Board reviewed the foregoing background facts. It noted that Newsome's standards for construction of the homes met the requirement for "sound insulation adequate to insure that interior noise levels resulting from airport operations will not exceed those levels that would occur if the structure or land use were outside of the noise zone." TR § 5–815(a); *see also* § 5–822(b). The Board stated the specifics of the three variances previously granted in Lennox Park. Noting that both Newsome and MAA had

estimated 2.5 persons per dwelling on the Property, the Board observed "that approximately 68 additional persons would reside in the Noise Zone." The decision reviewed the testimony of MAA's Director of Aviation Noise Abatement to the effect that "65 to 70 people would substantially increase the noise impact zone," and that MAA further opposed the variance because "MAA does not expect any appreciable decline in future aircraft noise in the area due to the continuation of 80% west operations...." The Board ended its fact-findings by listing the uses of the Property that were permissible under the noise regulations.[5]

Turning to the Board's conclusions of law, two of them are relevant to Newsome's challenge to the Board's power. First, the Board relied on TR § 5-802, the legislative statement of the purpose of the "Noise Zone Regulations" subtitle of the "Aviation" title of the Transportation Article. Those purposes are to:

"(1) Provide a positive basis for abatement of existing noise problems in communities near airports and to prevent new noise problems; and

"(2) Protect the health and general welfare of the occupants of land near airports."

The Board, relying on the regulations, said flatly that "70 $L_{dn}$ is a very high noise exposure level for residential living," particularly as it affects the use of outdoor areas. The Board concluded that "[b]y adding a significant number of residents to an area of very high airport noise, the granting of a

---

**5.** In the vacuum of the noise regulations, without regard to the Howard County zoning requirements, the Board found the following uses would be permissible:

"(a) Office buildings—personal, business, professional
(b) Commercial (retail)—movie theaters, restaurants
(c) Commercial (wholesale, some retail) industry, manufacturing, utilities
(d) Golf courses, riding stables, water recreation, cemeteries
(e) Livestock farming, animal breeding
(f) Other agricultural uses."

variance would result in the creation of a new noise problem," contrary to the purpose of the noise zone regulatory scheme.

Second, the Board addressed the aspect of a variance dealt with in TR § 5–815(d). It provides:

"When reviewing a request for a variance under the airport noise zone regulations, the board shall consider any facts and circumstances relevant to the request for variance, including any testimony or evidence presented regarding possible impacts on the surrounding community of the grant or denial of the proposed variance."

On that aspect of its conclusions, the Board found

"that the scope of the new noise problem which would be created if the variance were granted outweighs considerations of the present residential development of the area. It should be noted that the size of the proposed development is far greater than in the Board's recent decisions to grant variances for single-family residences in the area."

The Board also distinguished its three prior grants of variances. It noted that "[e]ach involved only one or two homes and, in two of them, the noise level was significantly lower." In an accompanying footnote the Board explained that the third variance, granted for a site with a 71 $L_{dn}$ noise exposure, had been granted to an applicant who had lived immediately adjoining the site "for seven years and was not bothered by the airport noise." None of the prior residences, said the Board, "involved high density development as proposed by [Newsome], but rather proposed low density development consistent with the existing development of the area." [6] The Board summed up its holding as follows:

"If a variance were granted, a significant number of people would be exposed to a noise level incompatible with normal

6. Newsome does not contend, and we do not understand the Court of Special Appeals to have held, that the Board overstepped its powers by attempting to regulate the minimum lot size per dwelling. Although lot size per dwelling affects the total population anticipated in the 6.3 acres comprising the Property, we interpret the Board's concern to have been with the total increase in residential population in the noise zone.

patterns of living, particularly outdoor living. This noise level is very high and it is not expected to change appreciably in the future. To grant a variance in these circumstances would contravene the purpose of Subtitle 8.... In the interest of protecting the health and welfare of those who might be exposed to excessive levels of aircraft noise at the Subject Property, the Board will deny the variance...."

The Court of Special Appeals recognized that MAA was authorized to establish limits for noise exposure, "to establish and implement a plan for the monitoring and abatement of noise on impacted land use, and to enact standards for the adaptation of structures within the noise zones...." *Maryland Aviation Admin. v. Newsome*, 99 Md.App. at 279, 637 A.2d at 474. But that court said that "[n]owhere in the noise zone regulations is there any reference to regulation of density within the affected areas." *Id.* at 279–80, 637 A.2d at 474. In the view of the intermediate appellate court, the Howard County R–12 zoning determined both land use and density. *Id.* at 281, 637 A.2d at 475. It concluded that a determination denying a variance "could not be based upon the anticipated increase in density." *Id.*

Our conclusion, derived from the regulatory scheme as a whole, is diametrically opposite that of the Court of Special Appeals. In the noise zone of a State-owned airport, no person, without a permit from MAA, may:

"(1) Establish or construct any new structure;

(2) Make any new use of any existing structure or land; or

(3) Substantially alter any existing structure or use of land."

TR § 5–821(a). If the proposed action would enlarge or create an impacted land use area, MAA is prohibited from issuing the permit. TR § 5–821(c).

The variance power in the Board under TR § 5–822(b) is essentially a safety valve on the otherwise flat prohibition. In traditional zoning, variances ordinarily are designed to prevent unreasonable and unnecessary hardships

or practical difficulties. *See generally,* as to requested use variances, *Pem Constr. Co. v. City of Baltimore,* 233 Md. 372, 376–77, 196 A.2d 879, 881–82 (1964); *Marino v. City of Baltimore,* 215 Md. 206, 216–19, 137 A.2d 198, 202–03 (1957); *Gleason v. Keswick Improvement Ass'n,* 197 Md. 46, 50, 78 A.2d 164, 165–66 (1951); and *Anderson v. Board of Appeals,* 22 Md.App. 28, 38–39, 322 A.2d 220, 226 (1974); *cf.* TR § 5–507(a) (articulating "practical difficulty or unnecessary hardship" standard for grant of variance by Board from zoning restrictions designed to protect the aerial approaches of State-owned airports). In traditional zoning, "the detriment to the applicant [for a variance] must be weighed against the benefit to the community in maintaining the general plan," *Easter v. City of Baltimore,* 195 Md. 395, 401, 73 A.2d 491, 493 (1950). That principle similarly should be applicable to the subject environmental zoning.

█ Under the airport noise regulations the general purpose is to "[p]rotect the health and general welfare of the occupants of land near airports." TR § 5–802(2). The source statute for the airport noise regulations, the Maryland Environmental Noise Act of 1974, also made findings confirming the above-quoted purpose of the airport noise regulations. *See* Chapter 287 of the Acts of 1974, 1974 Md.Laws at 1002–03 (codified as amended at Md.Code (1982, 1993 Repl.Vol., 1994 Cum.Supp.), § 3–102(a) of the Environment Article).[7] Because the legislature was concerned with the effect of exces-

---

7. Section 3–102(a) of the Environment Article reads:
   "The General Assembly finds:
      (1) That the people of this State have a right to an environment that is free from any noise that:
         (i) May jeopardize their health, general welfare, or property; or
         (ii) Degrades the quality of their lives;
      (2) That there is a substantial body of knowledge about the adverse effects of excessive noise on the public health, the general welfare, and property, and that this knowledge should be used to develop environmental noise standards that will protect the public health, the general welfare, and property with an adequate margin of safety; and
      (3) That it is essential to have coordination and statewide leadership of the noise control activities of the many State agencies and the county and local governments."

sive noise on people, the General Assembly necessarily intended for the Board, when deciding whether to grant a variance, to consider the number of persons who would be exposed to a prohibited level of noise pollution.

Indeed, limiting the number of persons exposed to noise around airports is a recognized strategy for dealing with airport noise pollution. The Federal Aviation Safety and Noise Abatement Act of 1979, Pub.L. 96–193, 94 Stat. 50 (Feb. 18, 1980) (codified as amended at 49 U.S.C. § 2101 *et seq.*) provided assistance to airport operators in preparing and carrying out noise compatibility programs. 1A F. Grad, *Treatise on Environmental Law* § 5.03, at 5–59 (1994). That enactment "and its amendments marked a clear departure from earlier aviation noise control efforts in emphasizing for the first time federal assistance to noise compatibility programs—i.e. programs applying land use techniques to separate the source of the noise from its impact." *Id.* Senate Report No. 52 on the proposed federal law discusses the land use compatibility strategy:

"State and local governments are directly and uniquely responsible for insuring that land use planning, zoning, and land development activities in areas surrounding airports are compatible with present and projected aircraft noise exposure in the area.

"Control of compatible land use around airports is a key tool *in limiting the number of citizens exposed to unacceptable noise impacts,* and should remain exclusively in the control of State and local governments. Occasionally, it is a power enjoyed by individual airport operators; some operators are municipal governments that can impose appropriate land use controls through zoning and other authority. But even where municipal governments themselves are operators, the noise impacts of their airports often occur in areas outside their jurisdiction....

"... [N]o amount of Federal effort to control noise at the source (the aircraft) or through the use of designated airspace will reduce noise to theoretically acceptable levels. Immediate and productive land use control measures must

be implemented at the local level to complement Federal efforts to achieve a livable environment."

S.Rep. No. 52, 96th Cong., 2d Sess. 3–4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 89, 91–92 (emphasis added). In *Harrison v. Schwartz,* 319 Md. 360, 374 n. 6, 572 A.2d 528, 535 n. 6 (1990), we described this language as dealing with "zoning to keep residential and other incompatible activities away from airports."

The Court of Special Appeals found support for its holding in an amendment to House Bill 552 in the course of its enactment as Chapter 509 of the Acts of 1989. The enactment amended, *inter alia,* TR §§ 5–815, 5–821, and 5–822. As introduced, the title of the bill included among its purposes "prohibiting political subdivisions from increasing the number of noise sensitive land uses within a noise zone under certain circumstances." 1989 Md. Laws at 3189. The quoted language was stricken in the course of passage. The Court of Special Appeals "glean[ed] from this deletion the legislative intent not to interfere with a political subdivision's decisions regarding residential density." 99 Md.App. at 280 n. 4, 637 A.2d at 474 n. 4. Newsome adopts this analysis and submits that "[t]o permit the Board to usurp the authority of local government to determine density in its denial of a variance from the noise regulations ... conflicts directly with the express zoning authority conferred on Howard County." Brief of Respondent at 14–15.

■ Chapter 509 of the Acts of 1989 contains a legislative preamble. It recites that Chapter 545 of the Acts of 1987 had directed MAA, in cooperation with the Board, "to strengthen zoning permit procedures to further protect the general public health, safety, and welfare of persons residing near" BWI. 1989 Md. Laws at 3190. The preamble further recites that "strengthening of zoning permit procedures requires" the amendments to Title 5, Subtitle 8 of the Transportation Article that are embraced in Chapter 509. *Id.* Among the amendments strengthening permit procedures was the addition of new subsection (d) to TR § 5–821. It provides:

"Unless a person has an appropriate permit issued by [MAA] or a variance granted by the Board ... a political subdivision may not approve a final subdivision plan or issue any permit that is prerequisite to the construction of improvements in a noise zone established under this subtitle."

1989 Md. Laws at 3192. Thus, the *operative* provisions of Chapter 509 make plain that prohibition under the State-owned airport noise control regulations overrides permission by Howard County.

■ Newsome further contends that population "density" is an improper consideration in a variance case because the Board is only empowered to consider the factors set forth in TR § 5–815(a) and (d). Subsection (a) has been a part of the noise zone regulations since their inception. *See* Md.Code (1957, 1976 Repl.Vol.), Art. 1A, §§ 8–803(d)(2) and 7–703(h). Subsection (a) is concerned with the sound insulation of a structure and its interior noise levels. Admittedly Newsome's proposed dwellings will satisfy those requirements. Under subsection (d) the Board "shall consider" any relevant facts "including ... possible impacts on the surrounding community of the grant or denial of the proposed variance." The substance of present subsection (d) was added to § 5–815 by Chapter 545 of the Acts of 1981. Thus, if Newsome's contention is correct, prior to 1981 compliance with § 5–815(a) would have been all that was required to obtain a variance. But that is not so.

TR § 5–815(a), and its predecessor codifications, have always provided that the Board "may grant specific variances, if interior insulation meets the statutory standard." The same bill which added subsection (d) to § 5–815, Senate Bill 518 of the 1981 legislative session, also sought to amend subsection (a) by striking "may" and inserting "shall." 1981 Md. Laws at 2236. A bill summary, apparently prepared by the staff of the Constitutional and Public Law Committee to which the bill was referred, explained the effect of the proposed change in subsection (a):

"Rather than allow, this bill would require the Board ... to grant a variance from noise zone regulations in all cases where a showing is made that a structure's design or modification insures that inside noise levels are no higher than if the structure was outside an airport noise zone."

The Maryland Department of State Planning, in prepared testimony, opposed the change, saying:

"A variance is traditionally a discretionary tool to provide for relaxation of regulation under special circumstances. The primary purpose of the State's Airport Noise Zone Program is to prevent substantial increases in residential development around State Airports at locations where it has been determined that noise levels are so high as to be detrimental to the public health. At times, the Board ... will grant variances to the noise regulations in cases involving a single proposed structure with adequate sound insulation and which represents an 'in-fill' to existing residential development. However, if the proposal involves many dwelling units, establishing a new pattern of residential development near an airport, the Board would normally act to deny such extensive development in a hazardous location. We feel that the Board must retain its flexibility in granting variances in order to satisfy the overall purpose of the law."

*Airport Noise Zone Variances, 1981: Hearings on S. 518 Before the Constitutional and Public Law Committee,* testimony of Maryland Department of State Planning (*microfilmed at* S. 581 Legislative Reference File (1981)). The sponsor of the bill thereafter proposed that it be amended by reinserting "may" and deleting "shall." The amendment carried.

State Planning's description to the committee of the variance process is precisely how the process functioned in the instant matter. The Board's consideration of a variance application is not limited to interior sound insulation and the effect on the neighborhood.

■ Newsome's final argument is somewhat attenuated. The argument invokes § 5–815(d) and asserts that the Board exceeded its delegated authority by ignoring "the fact that the

surrounding community desired residential uses as opposed to industrial uses...." Brief of Respondent at 31. The argument involves the testimony before the Board by Newsome's engineer, who is referred to in the Board's opinion, quoted below, as the applicant's consultant.

"The Board takes note of the proximity of the Subject Property to Applicant's other property now zoned M–2— Industrial. While Applicant has petitioned for rezoning of the Subject Property to an industrial classification, he withdrew the request. His consultant indicated the community opposed the request. This hearsay testimony was not supported by testimony of community residents. The Board has no indication of the community's view on Applicant's proposed high density development as opposed to the present low density residential development of the area. Howard County's desires as to the use of the Subject Property were also not clearly stated at the hearing."

Newsome's brief argues that the Board rejected the engineer's testimony as hearsay and did so erroneously, inasmuch as administrative agencies may consider reliable hearsay. In this way Newsome returns to an evidentiary argument submitted to the Court of Special Appeals but not reached by that court.

Before the Board there was no testimony from any resident of Lennox Park, from any representative of that community, or from any representative of Howard County. The record of the aborted application for rezoning by Howard County was not introduced. We read the Board's opinion simply to state that it had insufficient information on which to make further findings. That is neither an erroneous exclusion of evidence nor an overstepping of delegated authority. Thus, there is no need to remand to the Court of Special Appeals for its consideration of the unanswered argument.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE*

*ARUNDEL COUNTY AND REMANDING THIS ACTION TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH DIRECTIONS TO ENTER A JUDGMENT AFFIRMING THE ORDER OF THE BOARD OF AIRPORT ZONING APPEALS. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, R. WAYNE NEWSOME.*